## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## Newport News Division

EDWARD LAMB,

            Plaintiff,

v.                                    ACTION NO. 4:09cv149

NEXTEL COMMUNICATIONS
OF THE MID-ATLANTIC, INC., ET AL.

            Defendants.

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia, by an order of reference entered June 18, 2010.

This case was referred for a report and recommendation on cross Motions for Summary Judgment by the plaintiff, Edward Lamb ("Lamb"), and the defendants, Nextel Communications of the Mid-Atlantic, Inc., Nextel Communications, Inc., and Nextel Communications, Inc. Change of Control Retention Bonus and Severance Pay Plan and Plan Trustees (collectively "Nextel"), pursuant to Federal Rule of Civil Procedure 56. [Doc. Nos. 28 & 30, respectively.] For the reasons stated herein, the Court recommends that both parties' Motion for Summary Judgment be DENIED and that judgment be entered in favor of Nextel pursuant to Federal Rule of Civil Procedure 52; alternatively, the Court recommends Lamb's Motion for Summary Judgment be DENIED and that Nextel's Motion for Summary Judgment be GRANTED.

## I. FACTUAL AND PROCEDURAL HISTORY

On January 1, 2001, Nextel hired Lamb as a Director. Some time later, Nextel promoted Lamb to Senior Director, a position classified as "E8" in Nextel's employment hierarchy. (Pl.'s Br. Mot. Summ. J. at 3) [Doc. No. 29.] Included among the benefits with this position was participation in Nextel's Change of Control Retention Bonus and Severance Pay Plan (the "Plan"). (Def.'s Br. Mot. Summ. J. at 2) [Doc. No. 31.] As stated by counsel for both parties at the hearing on these motions, the purpose of the Plan was to retain a cohesive core of employees, in light of corporate merger discussions, by providing financial bonuses or severance benefits if a merger occurred and their positions were eliminated. In fact, on December 15, 2004, Nextel agreed to merge with Sprint Corporation, and by August 12, 2005 the merger transaction was completed. (Pl.'s Br. Mot. Summ. J. at 3-4.)

At that point, sometime in or before August 2005, while Lamb was the Director of the Hampton, Virginia Call Center, he began discussions with his supervisors regarding his future with the new company. (Def.'s Br. Mot. Summ. J. at 3.) A string of email correspondence and telephone conversations between Lamb and various management and human resources personnel, including John Battaglia, Brian Cohn, and Cheryl Wright, indicated Nextel's contemplation that Lamb remain employed as a Unit Manager in Hampton. [R. 45-51.][1] Disagreement existed, however, regarding the meaning of these discussions. While Lamb admitted he "was given an inchoate, verbal representation that he could have a managerial position with the successor entity," he claimed he never received a "formal offer," including information regarding salary, job description, and

---

[1] Page citations are to the administrative record previously filed by the plaintiff, Exhibit 1, Doc. No. 22.

responsibilities. (Pl.'s Br. Mot. Summ. J. at 5.)

By the fall of 2005, conversations with management regarding Lamb's future reached an impasse. Despite the communication with Battaglia, Cohn, and Wright, as late as October 20, 2005, Lamb claimed he received no offer of continued employment. Nextel, for its part, considered Lamb's action, or lack thereof, a refusal of the offer to serve as the Hampton Unit Manager. (Def.'s Br. Mot. Summ. J. at 4.) On November 25, 2005, as understood by all parties, Lamb's position with Nextel was eliminated, yet the characterization of his separation with Nextel remained outstanding. On the one hand, Lamb argued he had not resigned, quit, or voluntarily ceased his employment with Nextel (Pl.'s Br. Mot. Summ. J. at 9), and thus he was eligible for benefits under the terms of the Summary Plan Description (SPD),[2] and the Plan. [R. 5, 23.] On the other hand, Nextel maintained that Lamb was offered employment and refused the assignment designated for him. Therefore, when Lamb's pre-merger position was eliminated, Nextel asserts his decision not to accept the Unit Manager post with the new Nextel entity equated to his resignation, and thereby eliminated his eligibility for Plan benefits. (Def.'s Br. Mot. Summ. J. at 4.)

Despite the discord between the parties as to the circumstances of Lamb's separation and the characterization of the termination, on January 2, 2006, Lamb filed a claim for benefits under the Plan. (Pl.'s Br. Mot. Summ. J. at 6.) On May 4, 2006, the Change of Control (COC) Administration Committee (the "Committee") denied Lamb's claim largely due to its finding that Lamb was offered

---

[2] The Summary Plan Description is a user-friendly version of the details of the Plan. As it states, "[t]he information in this summary is presented in everyday language to help you understand your rights and benefits under the Plan. It does not however, contain all the details of the Plan . . . . EXCEPT WITH RESPECT TO THE CLAIMS PROCEDURE DESCRIBED IN ON PAGES 6 THROUGH 8, IF THERE IS ANY INCONSISTENCY BETWEEN THIS SUMMARY AND THE PLAN DOCUMENT, THE PLAN DOCUMENT WILL GOVERN." [R. 3] (emphasis in original).

another position in the company, refused to accept that position, and therefore voluntarily resigned. [R. 55-56.] Lamb appealed the denial of benefits on May 16, 2006, and supplemented the appeal on July 13, 2006. (Pl.'s Br. Mot. Summ. J. at 6.) The Committee did not respond to Lamb's appeal which, under the terms of the SPD was to be interpreted as a denial of the appeal. [R. 9.]

On November 25, 2008, Lamb filed a complaint pursuant to the Employee Retirement Income Security Act (ERISA) against Nextel in the Circuit Court for the City of Hampton. The action was properly removed to this Court on November 13, 2009, approximately three weeks after service of process was effectuated on Nextel. (Def.'s Br. Mot. Summ. J. at 5.) Given these facts and chronology, in consideration of the body of law governing ERISA, the substantive issue presented to the Court is whether Lamb was entitled to Plan benefits as a result of the circumstances surrounding the conclusion of his employment with Nextel. In short, the answer to this question is no, as Lamb is unable to prove the Committee abused its discretion in classifying Lamb's separation as voluntary under the SPD and Plan provisions.

Separately, however, the procedural mechanism upon which this issue is presented addresses a void in Fourth Circuit law and thus explains the submission of the Court's alternative resolutions. Here, the issue is whether a motion for summary judgment is the proper pleading to resolve an ERISA case brought under § 1132(a)(1)(B) and reviewed under an abuse of discretion standard. While the Circuit Courts of Appeals have split on this issue, the Fourth Circuit has provided little guidance. Accordingly, the Court will first address the standard of review for this type of ERISA plan; second, address the procedural posture under the Rule 56 motion for summary judgment standard and highlight why this approach may be inappropriate; finally, the Court will review the merits of the record and submit its recommendation as to the proper disposition of the case.

# II. ANALYSIS

*PART A: Standard of Review, ERISA § 1132(a)(1)(B) and the Nextel COC Plan*

As previously alluded to in the Court's April 9, 2010 Order [Doc. No. 26], "[i]t is well settled that a denial of benefits challenged under ERISA § 1132(a)(1)(B) is subject to a deferential 'abuse of discretion' standard of review when 'the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Stanley v. Metro. Life Ins. Co.*, 312 F. Supp. 2d 786, 790 (E.D.Va. 2004) (quoting *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989)). Furthermore, the grant of discretionary authority need not be explicit. The Fourth Circuit has recognized an implicit grant of discretionary authority, for example, in cases in which the administrator had the authority to "construe the terms of the Plan and resolve any disputes which may arise with regard to the rights of any persons under the terms of the plan." *United McGill Corp. v. Stinnett*, 154 F.3d 168, 171 (4th Cir. 1998). Likewise, this Circuit has found implied discretionary authority when the administrator was given "full and final determination as to all issues concerning eligibility for benefits" and was "authorized to promulgate rules and regulations" regarding the plan. *Boyd v. Trustees of United Mine Workers Health & Retirement Funds*, 873 F.2d 57, 59 (4th Cir. 1989).

This case is factually indistinguishable from *Stinnett* and *Boyd*. Here, the Plan bestows upon "the Company," Nextel, the discretionary authority to "carry out the purposes of the Plan or to *interpret the terms* and conditions of the Plan . . . ." [R. 27] (emphasis added.) Moreover, the Plan states that "the Company shall *determine the rights* of any employee of the Company to any Retention Bonus or Severance Compensation hereunder." [R. 27] (emphasis added.) Just as in *Stinnett*, where discretionary authority was found, the Plan in this case gives the administrator the

power to interpret the terms of the Plan. Also, just as in *Boyd*, the Plan vests in the administrator the power to determine eligibility for benefits.

While the Court acknowledges Lamb's argument suggesting that § 11(e) and § 16(d) vitiate the discretionary grant of authority, Lamb cites no authority to support that proposition. (Pl.'s Br. Mot. Summ. J. at 8.) Thus, although the argument may be sound logically, it is not supported legally. Nextel also makes its own argument, countering that even if Lamb were not required to exhaust his administrative remedies, he chose to avail himself of the Committee's decision. Nextel asserts that this choice should preclude Lamb's argument, and the Committee's decision should be reviewed under the applicable legal standard. (Def.'s Br. Opp. Pl.'s Mot. Summ. J. at 8) [Doc. No. 32.] However, regardless of Lamb's choice, and irrespective of either party's argument, cases make clear that in this situation, the proper standard of review is abuse of discretion.        Finally, the Court has considered Lamb's claim, that the standard of review in the April 9, 2010 Order was "clearly erroneous." (Pl.'s Reply Mem. Supp. Mot. Summ. J. at 6) [Doc. No. 34.] For the reasons just reiterated, the Court finds the holding to be correct.

### PART B: Standard of Review, Summary Judgment

#### 1. Routine Framework

Typically, the standard of review for deciding a summary judgment motion is straightforward. The rules provide that summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c)(2). In deciding whether such a genuine issue of material fact exists, the Court must view the record taken as a whole and assess whether a rational trier of fact could find for the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986). If so, then summary judgment is inappropriate, as this indicates a genuine issue to be decided at trial. *Id.* This basic test notwithstanding, the analysis of Rule 56 motions can be more difficult. For example, in cases such as this, there is the added complexity of dueling cross motions for summary judgment. Although most actions with competing motions for summary judgment are disposed of as a result of those motions, "simply because both parties move[] for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D. H. Overmyer Leasing Co.*, 401 F.2d 689, 692-93 (4th Cir. 1968)). In other words, there is no requirement that summary judgment be entered for either party if both parties concurrently move for summary judgment. *See id.*

Importantly, however, there is the additional, controversial question regarding the application of Rule 56 in the context of ERISA, specifically § 1132(a)(1)(B) and the abuse of discretion standard of review. Generally speaking, the rules above govern motions for summary judgment. Courts are to: grant concessions to the non-moving party to determine if any issue of material fact exists; and grant one of two competing, contemporaneous, motions for summary judgment if no such material issue of fact is outstanding and an award is warranted. Still, when a motion for summary judgment is presented in an § 1132(a)(1)(B) ERISA dispute, there is division among the Circuit Courts of Appeals, and a void in Fourth Circuit law, as to whether a grant of summary judgment is the appropriate mechanism to resolve the case. Should summary judgment, more generally, be entered for either party, even if there is no material fact in dispute? Does it matter if the ERISA plan gives a discretionary grant of authority to interpret the terms of the plan to the plan administrator? If the case is being viewed under an abuse of discretion standard, why should a rule designed as an antecedent to trial be used to dispose of the case? These questions highlight the vacuum of authority

in the Fourth Circuit as to the use and extent of Rule 56 in deciding ERISA cases. As discussed below, light has been shed by the Sixth Circuit, which has most forthrightly addressed the issue and has determined Rule 56 motions are inapplicable for all § 1132(a)(1)(B) cases. Closer to home, while the Fourth Circuit remains largely silent, this district has found motions for summary judgment in the context of *de novo* review cases acceptable, but has suggested they are inappropriate for abuse of discretion cases.

### 2. The Competing Arguments

There are two sides to this infrequently addressed issue. On the one hand, in support of utilizing Rule 56 motions to decide these cases, it has been said that, "in an ERISA case where review is based only on the administrative record before the plan administrator . . . summary judgment is simply a vehicle for deciding the issue." *Orndorf v. Paul Revere*, 404 F.3d 510, 517 (1st Cir. 2005). Likewise, and more specifically applying to the abuse of discretion standard, courts in the Ninth Circuit have followed the rule that:

> [w]here the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine issue of material fact exists, do not apply.

*Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999), *overruled on other grounds, Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir. 2006) (en banc). Similarly, in a concurring opinion, Judge Cole of the Sixth Circuit found "no reason to address whether summary judgment [was] an appropriate way in which to dispose of ERISA cases generally," even in a situation where the plaintiff challenged the district court's disposition of the case by its grant of summary judgment. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 617 (6th Cir. 1998)

8

(Cole, J., concurring).[3] Judge Cole seems to suggest that a merits-focused-model to tackle the substantive issue of the ERISA dispute without quarreling with the procedure used to bring the issue to the court is the correct approach.

Thus, the Court may choose to follow the approach of the First and Ninth Circuits and spearhead a similar rule for the procedural steps in disposing of ERISA cases in this district. No doubt, the acknowledged practice of filing cross motions for summary judgment facilitates resolution in an expedient, cost effective, and familiar manner to the Court and practitioners. Indeed, "a primary goal of ERISA was to provide a method for workers and beneficiaries to resolve disputes over benefits inexpensively and expeditiously." *Perry v. Simplicity Eng'g*, 900 F.2d 963, 967 (6th Cir. 1990); *see* H.R. Rep. No. 93-533, at 1 (1974) *reprinted in* 1974 U.S.C.C.A.N. 4639, 5000. A reduction in transaction costs, and perhaps an increase in judicial economy, is an attractive feature of continued use of cross motions for summary judgment. While this approach is not free from criticism, if the Court decides to rule in favor of one of the two competing motions for summary judgment in this instant action, for the reasons stated below, *see infra* Part C, the Court recommends Nextel's Motion for Summary Judgment be GRANTED.

On the other hand, while there is no binding precedent prohibiting ERISA cases from being resolved by motion for summary judgment, there are strong indications from the Fourth Circuit, Sixth Circuit, Tenth Circuit, and even from within this district itself, that an alternative procedural mechanism to resolve ERISA disputes is necessary. From the Court's extensive research, the first

---

[3] Although Judge Cole announced the judgment of the Court as to the disposition of the case because he found it unnecessary to address whether granting summary judgment was appropriate, Judge Gilman filed a concurring opinion to which Judge Ryan joined. *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998); *see also Neumann v. Prudential Ins. Co. of Am.*, 367 F.Supp.2d 969, 979 n.14 (E.D.Va. 2005).

appellate court to address the appropriateness of Rule 56 motions in similar types of situations was the Tenth Circuit in *Olenhouse v. Commodity Credit Corp.* 42 F.3d 1560 (10th Cir. 1994). In that case, involving wheat farmers who sued a USDA agency, the Tenth Circuit noted that "[a] district court is not exclusively a trial court" in some cases it must act as an appellate court in its review of administrative decisions in addition to its *nisi prius* functions. *Id.* at 1580. When functioning as such, it must bear in mind that "[m]otions to affirm and motions for summary judgment are conceptually incompatible with the very nature and purpose of an appeal." *Id.* In that case, the district court's decision was ultimately reversed due to its failure to properly apply the arbitrary and capricious standard, and for its failure to properly conduct a substantive review of the record. *Id.* This sentiment was echoed three years later in a District of Colorado case that dealt specifically with ERISA. *See Clausen v. Standard Ins. Co.*, 961 F.Supp. 1446, 1455 (D.Colo. 1997). At the outset of the discussion, the court noted how it found "summary judgment an inappropriate vehicle for evaluating the arbitrariness and capriciousness of an administrator's denial of disability benefits under ERISA." *Id.*

Besides the early, persuasive input of the courts in the Tenth Circuit, the most authoritative line of support for the position that motions for summary judgment are inappropriate to resolve ERISA abuse of discretion-standard cases begins with the Fourth Circuit's subtle approval of the Sixth Circuit's majority-*Wilkins* decision, which created an alternative paradigm for case resolution besides the routine disposition by cross motions for summary judgment. *See Phelps v. C.T. Enter., Inc.*, 394 F.3d 213, 218 (4th Cir. 2005). In *Phelps*, the court expressed that it shared the "reservations that the Sixth Circuit articulate[d]" in *Wilkins*, yet it obviated those concerns by noting they arose primarily in § 1132(a)(1)(B) claims, which were not the subject of the *Phelps* case. *Id.*

10

Notably, *Wilkins* was a clear rebuke of not only the use of summary judgment in ERISA cases, but also the use of bench trials. The Sixth Circuit in its controlling opinion on the issue,[4] concluded that bench trials were inappropriate because they would inevitably lead to the introduction of evidence that was not presented to the plan administrator and, under circuit precedent, even under *de novo* review, such evidence was impermissible. Moreover, a bench trial would be counter to ERISA's efficiency goals. *Wilkins*, 150 F.3d at 618. The Court went on to add that precisely because bench trials were inappropriate, so too were summary judgment motions. The court reasoned that because circuit precedent made bench trials inapplicable, *see Rowan v. Unum Life Ins. Co. of Am.*, 119 F.3d 433, 437 (6th Cir. 1997), "it ma[de] little sense to deal with such an action by engaging a procedure designed solely to determine 'whether there is a genuine issue for trial.'" *Wilkins*, 150 F.3d at 618 (quoting *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249 (1986)). In sum, the court simply stated that a Rule 56 motion was the wrong tool to deal with these cases. As a result, instead of summary judgment, the Sixth Circuit devised a new model in which: (i) a district court was to conduct a *de novo* review based solely on the administrative record and render findings of fact and conclusions of law; (ii) only if evidence was offered in support of a procedural challenge to an administrator's decision could evidence beyond the administrative record be used; and finally (iii) the court concluded that Rule 56 motions would no longer be used. *Wilkins*, 150 F.3d at 619.

While *Wilkins* remains important for articulating an alternative framework to bring forth and

---

[4]Judge Cole's announcement of the decision of the court notwithstanding, Judge Gilman's opinion with respect to the procedural posture garnered the support of Judge Ryan and is therefore the opinion of the court on the procedural matter. *Wilkins*, 150 F.3d 609, 617 (1998); *see* note 3.

resolve ERISA cases, it specifically dealt with Sixth Circuit law. Significantly, one area in which this Circuit and the Sixth differ is in the scope of permissible evidence allowed in ERISA cases where the plan administrator has no discretionary authority; *i.e.*, *de novo* review applies. *See Neumann v. Prudential Ins. Co. of Am.*, 367 F. Supp.2d 969, 978-80 (E.D.Va. 2005) (Ellis, J.). *Compare Quesinberry v. Life Ins. Co.*, 987 F.2d 1017, 1035 (4th Cir. 1993) ("adopt[ing] a scope of review that permits the district court in its discretion to allow evidence that was not before the plan administrator"), *with Rowan*, 119 F.3d at 437 (stating that the district court's resolution of the ERISA issue must be based solely on the administrative record). As Judge Ellis astutely noted, while the Sixth Circuit strictly limits both *de novo* and abuse of discretion standards of review to evidence before the plan administrator, such is not the case in the Fourth Circuit. *Neumann*, 367 F. Supp.2d at 978. In exceptional circumstances, a court in the Fourth Circuit *may* consider evidence not before the plan administrator. *Id.* at 979 (citing *Quesinberry*, 987 F.2d at 1025). Correspondingly, in some cases it is appropriate for courts of the Fourth Circuit to conduct a bench trial, albeit on the paper record, in a § 1132(a)(1)(B) action. *Id.* at 980. As a result, then, both bench trials and motions for summary judgment are compatible with Fourth Circuit precedent, unlike in the Sixth Circuit. *Id.*

Thus, the result reached in the Sixth Circuit would not carry over to this Circuit because it is permissible to have a broader scope of admissible evidence on *de novo* review, so the possibility for a bench trial remains. If a bench trial is possible, then a summary judgment motion is viable.

There is one immense caveat to Judge Ellis' precise analysis, however. Throughout the discussion on procedural posture he strains to reinforce the point that he is only referring to *de novo* review. Specifically, he points out in an advisory footnote how viewing the case under an abuse of discretion standard of review would likely change his analysis:

> [n]ot decided here is whether a different answer might obtain when a district court reviews a plan administrator's decision under a deferential abuse of discretion standard. In that case, different from a court conducting a de novo review of a plan administrator's denial of benefits, the district court is limited to the evidence that was before the plan administrator at the time of the decision. Additionally, instead of making its own findings of fact, the district court reviews the findings of the administrator to determine whether they are reasonable. *Thus, it may be that the summary judgment standard,* designed to determine whether "there are any genuine factual issues that properly can be resolved" by a fact-finder at trial *would make little sense when applied on abuse of discretion review and thus is inappropriate.*

*Id.* at 980 n.17 (internal citations omitted) (emphasis added). In essence, Judge Ellis seems to indicate a similar sentiment as that in *Wilkins*, which concluded that a Rule 56 motion is the wrong mechanism to bring the issue to the court. Whereas the *Wilkins* court found that in no situation were bench trials and Rule 56 motions appropriate, Judge Ellis' analysis led to the conclusion that in the Fourth Circuit bench trials and Rule 56 motions were permissible on *de novo* review, but perhaps "inappropriate" in abuse of discretion review. *Id.* As far as Judge Ellis' thoughts are revealed in his opinion, it appears the court is stating that a motion which, by its very nature, is designed to test the necessity of trial, is a useless tool in reviewing an administrative decision for reasonableness.

### 3. The Solution

If the Court adopts the position that Rule 56 motions are not the appropriate procedural conduit, what should replace them as the means of adjudicating ERISA abuse of discretion cases? Three approaches quickly come to mind. The first option could be to adopt the three step process of the *Wilkins* court. *See Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 619 (6th Cir. 1998). Unfortunately, however, permitting *de novo* review, the first prong of *Wilkins,* in a case where the plan administrator has discretionary authority is seemingly contrary to the Supreme Court's holding

in *Firestone Tire & Rubber Co. v. Bruch.* 489 U.S. 101 (1989). In that case, the Court held "that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard *unless* the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115 (emphasis added). For the reasons set forth in Part A the Court finds there is such a grant of authority in this case, and as such, the abuse of discretion standard should apply and *de novo* review should not be permitted. Thus, this model can quickly be dismissed.

Alternatively, a second and intriguing possible rule would be to consider the framework stated by the Tenth Circuit; have the district courts view abuse of discretion ERISA cases as appellate courts would. *Olenhouse v. Commodity Credit Corp.* 42 F.3d 1560 (10th Cir. 1994). Although, *Olenhouse* dealt with the Administrative Procedures Act and individuals claims' against public agencies, the court found the process of filing summary judgment "inconsistent with the standards for judicial review of agency action . . . ." *Id.* at 1580. Interestingly, the court stated that at least in these cases the "district court should govern itself by referring to the Federal Rules of Appellate Procedure." *Id.* The suggestion is intriguing, and perhaps applicable to ERISA abuse of discretion actions, however other than implying use of the Appellate Rules there is no substitute procedural mechanism offered to process these cases.

Finally, there is a third, and perhaps most promising option referenced in both *Wilkins* and *Neumann.* That proposal is to use Rule 52 bench trials to resolve the action. Although the Sixth Circuit found this equally problematic as employing motions to dismiss, due to circuit precedent, *see Wilkins*, 150 F.3d at 618, Judge Ellis stated quite pointedly that "even if a district court elects not to consider evidence beyond the record presented to the plan administrator, it seems appropriate

14

. . . for a district court to conduct a 'bench trial on the papers with the district court acting as the finder of fact.'" *Neumann,* 367 F.Supp.2d at 979 (quoting *Muller v. First Unum Life Ins. Co.,* 341 F.3d 119, 124 (2d Cir. 2003)). It is not difficult to apply this proposition to the abuse of discretion standard. The only alteration in reasoning required is to note that instead of the district court *electing* not to consider evidence, as in the proposal for *de novo* review, with the abuse of discretion standard, the court is *not permitted* to look beyond the evidence presented to the administrator. *See Firestone,* 489 U.S. at 115. If this approach is adopted, the Court could thereby conduct a bench trial pursuant to Rule 52, issue factual findings and conclusions of law, and avoid the unsuitable aspects of the application of Rule 56 in §1132(a)(1)(B) cases. Substantively this procedure would change the current practice of the Court very little, while at the same time re-aligning the text of Rule 56 with its function.

To summarize the results from the alternative procedural postures, it is important to recall that there is legitimate concern as to whether a Rule 56 motion is a proper way to dispose of an §1132(a)(1)(B) action. While there are clearly benefits to using cross motions for summary judgment in resolving these cases – including familiarity, judicial economy, and efficiency – there are also indications that a procedural rule designed to test the sufficiency of a case for trial is inapplicable when the substantive review is for an administrator's abuse of discretion. The Court feels compelled to address this matter in hopes of clarifying the rule for like-situated cases in the future. Regardless of which procedure is adopted by the Court, the prevailing party will be determined on the substantive law of ERISA in the Fourth Circuit and the facts of the case.

While these alternative approaches offered are not free from criticism, it appears to the Court that the last option is preferable over the rest. For the reasons articulated above, the Court

recommends Nextel's Motion for Summary Judgment be DENIED and that Lamb's Motion for Summary Judgment be DENIED. Pursuant to the factual findings and conclusions of law discussed in Part C, next, the Court recommends entering judgment for Nextel, pursuant to Federal Rule of Civil Procedure 52.

***PART C: Evaluation of Plan Committee Decision***

Under the abuse of discretion standard, an administrator's decision "will not be disturbed if it is reasonable, even if this court would have come to a different conclusion independently." *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997). To be reasonable, the decision must be the "result of a deliberate, principled reasoning process" and be "supported by substantial evidence." *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997). When determining whether a plan committee's decision was reasonable, a court may consider the following eight factors: (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the material considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan; (5) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have. *Booth v. Wal-Mart Stores, Inc., Assoc. Health and Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000). Although this list is not exhaustive of the factors the Court may consider, it constitutes a significant starting point for evaluation of Lamb's claim. For the following factual and legal rationale, the Court finds that the Committee's claim denial was the product of a reasoned and principled decision making process based upon adequate inquiry and materials.

1. *Language of the Plan*

Lamb alleges that the Committee incorrectly interpreted the language of the Plan when denying his claim. Specifically, Lamb contends that the Committee improperly interpreted Section 4(c)(i) of the Plan, which states that a covered employee, not classified as an "EX" employee, will be entitled to severance compensation if he is terminated without cause. [R. 23.] "*Notwithstanding [§ 4(c)(i)]*, a Covered Employee will not be entitled to Severance Compensation if his employment with an Employer is terminated during the Severance Period for Cause or because: (i) of the Covered Employee's retirement or *voluntary withdrawal* from employment . . . ." [R. 23] (emphasis added.)

Lamb essentially makes three arguments with respect to the interpretation of the language of Section 4(c). First, Lamb points out that the Committee referenced only Section 4(c)(ii) in its denial letter, although Section 4(c)(i) was the relevant provision affecting Lamb. (Pl.'s Br. Mot. Summ. J. at 10-11.) Second, Lamb asserts that even if the Committee meant to refer to Section 4(c)(i), they improperly added the word "involuntary" to the Plan language – as the plan only spoke in terms of "termination of employment." (Pl.'s Br. Mot. Summ. J. at 11.) Lamb argues that the phrase "termination of employment" is neutral; thus he should be entitled to benefits under Section 4(c)(i) regardless of whether his termination was voluntary or involuntary. (Pl.'s Br. Mot. Summ. J. at 12-13.) Third, Lamb alleges that if the Plan is read to exclude Lamb's eligibility for benefits if his withdrawal was voluntary, then his departure cannot be interpreted as "voluntary." (Pl.'s Br. Mot. Summ. J. at 13-14.) Here, Lamb posits that Nextel's termination of his position and failure to make a "formal offer" add up to an "involuntary termination." (Pl.'s Br. Mot. Summ. J. at 14.) In support, Lamb references a letter from Nextel regarding a Founders' Grant of stock, which stated that Lamb's "separation from the company was the result of an involuntary termination." (Pl.'s Br. Mot. Summ.

17

J. at 14.) Lamb also argues that he was never made a "formal offer" and that the Committee erred by determining he received an offer based on the evidence before it. (Pl.'s Br. Mot. Summ. J. at 11-14.)

Regarding Lamb's first argument – the "scrivener's error" – the Fourth Circuit has explained that "not all procedural defects will invalidate a plan administrator's decision." *Ellis*, 126 F.3d at 235 (stating substantial compliance with the spirit of the regulation will suffice). For example, when addressing a denial letter that cited the wrong definition of a disability, this Circuit held that the mistake was not unreasonable and did not nullify a plan administrator's disability determination. *See Havens v. Metro. Life Ins. Co.*, 2006 U.S. Dist. LEXIS 57123, at *21-22, 2006 WL 2371117 (D.W.Va. Aug. 14, 2006); *Johnson v. Metro. Life Insurance Company*, 2009 WL 2973045 (W.D.N.C. 2009). Here, the Committee merely misstated the provision that they applied in their analysis. Lamb has failed to establish prejudice or why this mistake affected the Committee's analysis. *See id.* As such, this "scrivener's error" does not affect the reasonableness of the Committee's decision.

With respect to Lamb's next argument, that he should be awarded benefits regardless of whether his termination was voluntary or involuntary, the Court disagrees. Lamb states that reading the Plan as a whole, Section 4(c)(i) refers to both voluntary and involuntary terminations; however, what Lamb fails to state accurately is that Section 4(c)(i) directly references Section 4(e)(i). Section 4(e)(i) states that employees will not be entitled to severance compensation if they voluntarily withdraw from employment. [R. 23.] Lamb acknowledges that this subsection is the relevant Plan language; however, he tries to divorce the language in Section 4(c)(i) from that in Section 4(e)(i). ERISA plans are intended to be read as a whole and "plain language of an ERISA plan must be enforced in accordance with 'its literal and natural meaning.'" *See United McGill Corp. v. Stinnett*,

154 F.3d 168, 172 (4th Cir. 1998) (citing *Health Cost Controls v. Isbell,* 139 F.3d 1070, 1072 (6th Cir.1997)). Accordingly, Lamb's argument that he should be entitled to benefits – whether his termination was voluntary or involuntary – is erroneous, as the Plan clearly states that employees will not be entitled to benefits if they voluntarily withdraw from employment.

Finally, looking at Lamb's third argument, with respect to the Plan language, the Court finds the Committee's decision – that Lamb voluntarily withdrew from employment after being offered another position – to be reasonable and supported by the Plan. Lamb states "voluntary withdrawal from employment" is ambiguously defined in the Plan and that because his position was terminated, he cannot be construed to have "withdrawn voluntarily." (Pl.'s Br. Mot. Summ. J. at 13-14.) However, Lamb again improperly reads the Plan language in isolation. *See United McGill Corp.,* 154 F.3d at 172.

In making its determination that Lamb withdrew voluntarily, the Committee considered the Plan language, as well as the SPD. Under the subheading "Who is Eligible to Voluntarily Terminate Employment with Good Reason?", the SPD states:

> [y]ou will *not* be eligible to voluntarily terminate your employment with Good Reason if your salary grade level is an E7/E8 or S7/S8 immediately before the Change of Control Date and, during the Severance Period, your salary grade level is an equivalent or lower level. This would include, for example, situations where you are offered a position that would require you to relocate; where you are offered a position at a lower compensation level or where you are offered a position that represents a significant decrease in your duties, responsibilities and authority; and you decline the position offered. If you decline the position and the Company does not offer you another position, you will not be entitled to Severance Pay and other benefits under the Plan. You will also forfeit the second installment of the Retention Bonus.

[R 3-4](emphasis in original). The Committee determined that based on the Plan and this SPD

language, as well as the materials cited in the administrative record – including emails and correspondence – that Lamb received an offer; however, he chose not to act on the offer and instead voluntarily withdrew from employment.

Having read the Plan and the accompanying SPD, this Court is satisfied that the Committee reasonably interpreted the language of the Plan as a whole to conclude that Lamb's employment ended by way of "voluntary termination." This Court also finds that the Committee acted properly when they used the SPD to determine the meaning of "voluntary termination" within the Plan. *See Pegram v. Prudential Ins. Co.*, No. 3:08cv116, 2009 LEXIS U.S. Dist. LEXIS 56672, at *12 (E.D. Va. July 2, 2009) (citing *Pierce v. Security Trust Life Ins. Co.*, 979 F.2d 23, 26-28 (4th Cir. 1992) (noting that the SPD is a binding document required under ERISA to inform plan participants of activities that may result in disqualification, ineligibility, or denial of their benefits, and of their rights and obligations under ERISA)). Because the SPD helped clarify the meaning of "voluntary termination" and this meaning was consistent with the Plan language, the Committee reasonably used the SPD to aid its decision. *Kress v. Food Employers Labor Relations Ass'n*, 391 F.3d 563, 569 (4th Cir. 2004) (holding that where terms in an ERISA plan are readily interpreted based on the language of the plan, administrators are bound to follow the language of the plan as written).

Lamb cites a letter from Carmen Coletta, an Executive Compensation Manager with Nextel, for proof that he was involuntarily terminated. In particular, Lamb points to a sentence in the letter which states: "[t]his award normally would vest on the first anniversary of the merger, however, because your separation from the company was the result of an involuntary (not for cause) termination, your grant automatically vested with your separation." [R. 68.] However, this letter was referencing a Founders' Grant, which entitled him to ten shares of stock, it was not referring to his

benefits under the Plan, nor did it reference the Plan in any way.

Looking to the language of the Plan, it is clear that this letter cannot be regarded as a dispositive fact. After discussing examples of voluntary termination, the SPD states:

> Your decline of the position will be treated as a resignation of employment for purposes of this Plan only. You may, however, be eligible for severance benefits under the Company's Severance Benefits Plan or similar plan or policy that is in effect at the time you terminate your employment.

[R. 6.] This language represents the Plan's intention to separate the Plan from other benefits within the company, as well as to separate Committee decisions with respect to other employment matters or benefits. Consequently, Coletta's letter cannot be read as a dispositive fact characterizing Lamb's termination. Rather, it must be read properly in the context in which it was drafted – regarding the Founders' Grant of stock. Given the Plan and SPD taken as a whole, this Court finds that the Committee reasonably interpreted the language of the Plan to interpret the phrase "voluntary withdrawal from employment."

Furthermore, the Court finds that the Committee reasonably concluded that Lamb received an "offer of employment" within the meaning of the Plan. Lamb argues that the Committee improperly determined that Lamb received a "formal offer" based on the evidence before it. In support, Lamb cites the Restatement Second of Contracts, which states: "an offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *See* Restatement (Second) of Contracts § 24 (1981). *See also* Restatement (Second) of Contracts § 33(2) (1981) (stating that the terms of an offer must "provide a basis for determining the existence of a breach and for giving an appropriate remedy"). Lamb also cites *Chang v. First Colonial Savings Bank*, 242 Va. 388, 392, (Va.,1991),

which states that an offer must identify a bargained-for exchange.[5] Based on these definitions, Lamb argues that the Committee did not consider enough evidence to warrant their finding that an "offer" was made to Lamb. This argument, then, rests on how "offer" is defined.

When interpreting a term within an ERISA plan, the Committee should look to the Plan language first and foremost. *See United McGill Corp.*, 154 F.3d at 172. If the term meant to be applied in the Plan document is not clear, the Committee should then interpret the term's meaning based upon its "plain and ordinary meaning." *See Gilliam v. Nevada Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007). Here, "offer" is a term that is widely used; however, it can be used in many senses. Lamb alleges that he needed a "formal offer," whereas Nextel argues that there need only be an "offer." Thus, the term that is meant to be applied in the Plan is not "self-defining." *James v. General Motors Corp.*, 230 F.3d 315, 317-18 (7th Cir. 2000). Accordingly, the Committee interpreted the term based upon the evidence it had before it, which was proper under the power vested to it in the Plan. [R. 27.]

Importantly, when the plan document does not furnish the answer to a question, the answer given by the plan administrator "will ordinarily bind the court." *James*, 230 F.3d at 318 (citing *Ross v. Indiana State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1010 (7th Cir.1998) (stating: "[t]hat is implicit in the idea of deferential review of the plan administrator's interpretation"). It is only when that interpretation is *arbitrary and capricious* that it is unreasonable. *Id.* at 316 (emphasis added).

---

[5] Lamb cites Virginia case law in an effort to clarify the meaning of "offer" within the Plan. Although Lamb asserts that Virginia law applies and both parties stipulated that Virginia law applies during the hearing on the cross motions for summary judgment, the Plan explicitly provides that Delaware law shall govern the Plan. [R. 26.] In either event, the Committee's decision was reasonable based upon both states definition of offer. *See, e.g. Grasso v. First USA Bank*, 713 A.2d 304, 308 (Del.Super.,1998); *Chang*, 242 Va. at 392. *See also Gilliam*, 488 F.3d at 1194.

Here, the Court finds that the Committee made a reasonable interpretation based on both the Plan language referenced above, and also based upon the adequacy of the evidence cited in their denial letter. [R. 55 - 59.] The numerous emails and correspondence all point to an "offer" being made to Lamb, and at the very least, the Committee was reasonable in its determination.

*2. Purposes and Goals of the Plan*

Lamb next contends that given the purposes and goals of the Plan, it is improper "to interpret the Plan in a manner that denies benefits on the basis of some narrow technical argument." (Pl.'s Br. Mot. Summ. J. at 15.) As an initial note, Lamb fails to specify what "narrow technical argument" he is referring to. Throughout Lamb's briefing, he makes multiple "narrow technical arguments" in his own right: arguing that it does not matter if his termination was voluntary or involuntary; that he was not made an express, "formal" offer; and that the phrase "withdraw voluntarily" must be read in a light most favorable to himself. However, regardless of which argument he was referencing, this Court is satisfied that the Committee's determination was consistent with the stated purposes and goals of the Plan.

Looking at the subsection "General Statement of Purpose," the relevant Plan language states:

> The Company desires to assure fair treatment of its key employees in the event of a change of control and to allow them to make critical career decisions without undue time pressure and financial uncertainty, increasing their willingness to remain with the Company notwithstanding the outcome of a possible change-of-control transaction.
>
> The Company recognizes the possibility of a change of control exists and desires to assure itself of both the present and future continuity of management, desires to establish certain retention and severance benefits for certain of its Covered Employees (as defined below) applicable in a change of control, and wishes to insure that its Covered Employees are not practically disabled from discharging their duties in respect to a proposed or actual transaction involving a change of

23

control.

[R. 19.] This language, as is common in most change of control agreements generally, is meant to protect employees from negative impacts of a change of control event, and to provide employees with an adequate means for assuring future employment or peaceful departure. Lamb does not argue that the Plan's purpose and goals are improper, but rather that the Committee improperly interpreted the Plan's language in its decision and thus acted contrary to the purpose and goals of the Plan. For the reasons articulated above in the "Language of the Plan" section, as well as the forthcoming reasons laid out in the "Adequacy of the Materials Utilized by the Committee," the Court concludes otherwise. The Court finds that the Committee reasonably utilized the record and evidence before it to make a proper decision within the context of the Plan. Furthermore, the Court cannot find a "narrow technical argument" upon which the Committee relied to deny Lamb benefits, nor does Lamb set forth any evidence that would support this proposition.

### 3. *Adequacy of the Materials Utilized by the Committee*

Third, Lamb challenges the adequacy of the materials used by the Committee to support its claim denial, and also argues that because the Committee did not respond to his appeal, there is no indication that the Committee "read or considered anything in the appeal letter or its attachments." (Pl.'s Br. Mot. Summ. J. at 16.) The Court finds that the Committee cited adequate materials to justify its decision, and also abided by the express provisions of the Plan which did not require it to respond to the appeal.

In its May 4, 2006 letter, Nextel set forth the Committee's reasons for denying Lamb's claim, and also cited the relevant materials that were considered to make this determination. [R. 55 - 59.] Specifically, the Committee referenced a letter submitted by Lamb dated February 17, 2006, to Terry

24

Mellendorf; a letter submitted to the Committee dated January 2, 2006; emails between Lamb and various company representatives from August 31, 2005 through October 20, 2005; and the relevant pages of the Plan document and SPD. Together, the Committee determined that this evidence supported the fact that Lamb was not involuntarily terminated by the company, but rather chose not to accept a position and terminated his employment voluntarily.

The Committee referenced these numerous emails and correspondence in its denial letter, which collectively led the Committee to the conclusion that Lamb received an offer. In an email dated September 28, 2005, Lamb wrote to Cheryl Wright, Director of HR Operations: "If I do not accept the manager position in Hampton, am I eligible for the company severance package?" [R. 69.] In another email dated September 27, 2005, Cheryl Wright wrote to Lamb: "Since all call centers were 'slotted' into Sprint Nextel, you do have a position as a manager in the Hampton Center. It is now your choice whether to accept the manager position or not." [R. 71.] In emails between Lamb and Battaglia, Vice President, Contact Center, Lamb asked: "[y]ou mentioned me doing this unit manager position at the same pay level. What are the duties that you would envision?" [R. 58.] Together, this evidence, along with additional evidence, led the Committee to the conclusion that "the company desired to retain Mr. Lamb"; and "[w]hile Mr. Lamb may have preferred that the company terminate his employment without cause so that he would become entitled to severance and retention bonus under the COC Plan . . . the evidence suggests otherwise." [R. 58 - 59.]

Based upon this analysis and the evidence considered by the Committee, the Court is satisfied that there were adequate materials utilized by the Committee. Also, based on the Plan language, if the Committee does not respond to an appeal, it is deemed to have been denied. [R. 9.] Lamb therefore fails to state how the Committee's actions violated the express terms of the Plan.

25

### 4. Consistency with Other Provisions and Prior Interpretations

Lamb asserts that the decision was inconsistent with the relevant Plan language, and that the Committee did not articulate the reasons for the denial or appropriate Plan language giving credence to it. As stated above, the Committee cited numerous emails and correspondence to reach its conclusion. The Committee also wrote the relevant provisions in the Plan applying to Lamb - including Section 4(c)(i) which directly references Section 4(e)(i). [R. 56.] However, even if the Committee did not explicitly state all reasoning behind its denial; it was not required to, as "specific reasons" are enough. 29 U.S.C.A. § 1133(1)(2010); *Donato v. Metro. Life Ins. Co.*, 19 F.3d 375, 382 (7th Cir. 1994); 29 C.F.R. § 2560.503-1(f)(1)(2010). In the denial letter, the Committee put forth "specific reasons" for its denial, and Lamb has failed to establish why these materials led to an arbitrary or capricious decision.

### 5. Whether the Process was Reasoned and Principled

Lamb next argues that the Committee's decision was neither "reasoned" or "principled" by incorporating previous points. In particular, Lamb states that because the Committee did not write the phrase "voluntary withdrawal from employment" in its denial letter, there is no proof that they considered the phrase in their deliberations. (Pl.'s Br. Mot. Summ. J. at 16.) The Court finds this argument disingenuous.

The denial letter adequately states the reasons why Lamb's claim was denied, and also sets forth sufficient evidence to conclude Lamb received an offer, however instead chose to voluntarily withdraw from employment. Regardless of the denial letter's exact language, it is clear the Committee interpreted the phrase "voluntary withdrawal from employment" to reach its decision. This sentence was an integral component of Section 4(e)(i), which was directly referenced in the

denial letter. [R. 56.] Furthermore, the denial letter states that the Plan "*does not* provide employees at Mr. Lamb's grade level with eligibility for benefits upon *voluntary resignation* with Good Reason under the Good Reason provisions of the COC Plan." [R. 56](emphasis added). This statement clearly reflects the Committee's awareness of the distinction between "voluntary" and "involuntary" withdrawal from employment. For these reasons and the reasons stated above, the Court finds that the Committee properly considered Lamb's claim, and made a reasoned and principled decision based upon the language cited in its denial letter.

### 6. Consistency with ERISA Requirements

ERISA requires plan participants be notified in writing of any benefit denied, and that the plan participant be given an opportunity for a full and fair hearing by those denying the claim. *Fuqua v. Tarmac of Am., Inc.*, 228 F. Supp. 2d 755, 762 (E.D. Va. 2002) (citing 29 U.S.C. § 1133). Here, the Committee considered Lamb's claim and evaluated evidence put forth by Lamb. The Committee then wrote to Lamb detailing the reasons for its denial of his claim. This clearly follows the goals set forth in ERISA, as well as the procedural requirements.

In regard to the appeal, the SPD clearly provides that if you do not receive a written notice from Nextel within sixty days, "your claim will be deemed to have been denied on review in full."[6] Lamb fails to prove how the Committee failed to abide by the terms of the Plan, or ERISA's procedural or substantive requirements. As such, this Court finds that the Committee's decision was consistent with ERISA requirements.

---

[6] Here, the SPD is the proper guiding language, as the SPD explicitly governs the Claims Procedures described in Pages 6 - 8 of the Plan. [R. 3]; *see* note 2.

### 7. External Standards Relevant to the Exercise of Discretion

Looking to the External Standards prong, Lamb asserts: "[t]he liberal manner in which change in control agreements normally are interpreted and applied is an external standard which supports Lamb's claim." (Pl.'s Br. Mot. Summ. J. at 17.) This argument not only fails to specify how the Committee's decision was inflexible, but is also void of any case law or support.

The only possible external standards the Court can find that would have a bearing on the reasonableness of the Committee's decision are Lamb's references to external definitions of terms. For example, Lamb cites external definitions of "offer" and "voluntary withdraw from employment." (Pl.'s Br. Mot. Summ. J. at 11 - 14.) These arguments, which were addressed in the Language of the Plan prong, however, do not establish that the Committee's decision was arbitrary or capricious. Thus, the Court finds no external standard that alter the reasonableness of the Committee's decision.

### 8. Motives of the Committee and Conflicts of Interest

Finally, Lamb argues that the Committee operated under a conflict of interest. The Court agrees. Because the Plan is administered by Nextel, there is an actual conflict of interest. *See Fuqua*, 228 F. Supp. 2d at 763. However, the mere fact that there may be a conflict of interest does not render the decision invalid. *Id.* at 763-64. Rather, this is but one factor that must be weighed in determining the reasonableness of the Committee's decision. *Id.*

As acknowledged in the prior discussion, the Court is satisfied that the Committee's decision was not arbitrary or capricious. Even taking into consideration the conflict, the Court finds no evidence to suggest why the Committee had an improper motive or failed to follow the language of the Plan. The Plan vests in the Committee the power to interpret claims, and Lamb has failed to state

28

why its decision was arbitrary or capricious. Accordingly, the Court can find no reason to disturb the Committee's decision.

## PART D: Conclusion

As the Court methodically explained, the substantive standard of review for a §1132(a)(1)(B) ERISA case, in which there is a discretionary grant of authority, is abuse of discretion review. For the reasons noted in Part A, including the language of the COC Plan, the Court adopts this universally held standard of the courts of this Circuit. In addition to the standard of review for the substantive issue, the Court grappled with the procedural mechanism upon which this dispute was presented. Although cross motions for summary judgment are routinely utilized to resolve an ERISA case, a detailed analysis of the law suggests a different tool is needed to settle these matters. As suggested, the Court recommends implementing Rule 52 in place of Rule 56 to more closely align the purpose of the Rule with its application. Finally, regardless of the procedural mechanism used to resolve the case, the Court analyzed the merits of both parties' arguments, and by applying the *Booth* factors found Nextel's argument to be persuasive and correct. For these reasons, the Court makes the following recommendation.

## IV. RECOMMENDATION

After evaluating the Committee's decision under the criteria as set out in *Booth*, the Court finds the decision to be the product of a deliberate, principled reasoning process that is supported by substantial evidence. Under the abuse of discretion standard, and with the conflict of interest factored in, the Court concludes that the Committee's decision was reasonable. For the foregoing reasons, the Court recommends Lamb's Motion for Summary Judgment be DENIED and Nextel's Motion for Summary Judgement be DENIED. Based on the Findings of Fact and Conclusions of

Law stated in Part C, the Court recommends entering JUDGMENT in favor of Nextel. Alternatively, the Court recommends Lamb's Motion for Summary Judgment be DENIED and that Nextel's Motion for Summary Judgment be GRANTED.

## V. **REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(c):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this Report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir.), *cert. denied*, 467 U.S. 1208 (1984).

/s/
Tommy E. Miller
United States Magistrate Judge

Norfolk, Virginia
August 19, 2010

# CLERK'S MAILING CERTIFICATE

A copy of the foregoing Report and Recommendation was mailed this date to each of the following: *(VIA ECF)*

James Shoemaker, Jr., Esq.
Patten Wornom Hatten & Diamonstein LC
12350 Jefferson Ave
Suite 300
Newport News, VA 23602

Erin Ashcroft, Esq.
McGuire Woods LLP
101 W. Main Street
Suite 9000
Norfolk, VA 23510

Adam Garner, Esq.
McGuire Woods LLP
7 St Paul Street
Suite 1000
Baltimore, MD 21202

Fernando Galindo, Clerk

By _____

Deputy Clerk

August 19, 2010